## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| **ROCHEZ BROS., INC.,** | : | |
| | : | **Bankruptcy No. 01-32890-MBM** |
| Debtor. | : | |

...................................................................................................................

| | | |
|---|---|---|
| Rochez Bros., Inc., | : | **Chapter 11** |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adversary No. 04-2904-MBM** |
| | : | |
| **Sears Ecological Applications** | : | |
| **Company, Inc.,** | : | |
| Defendant. | : | |

Appearances:    Charles E. Bobinis, for Rochez Bros., Inc.
Joel M. Helmrich and Gary A. Kern, for Sears Ecological
Applications Company, Inc.

### MEMORANDUM OPINION

Rochez Bros., Inc., the instant debtor-in-possession (hereafter "the

Debtor"), brings the instant action against Sears Ecological Applications

Company, Inc. (hereafter "Sears") to recover from Sears, pursuant to 11 U.S.C.

§§ 549(a) and 550(a)(1), the value of 1,600 tons of road salt that was transferred

by the Debtor post-petition to Sears.  The parties have entered into a Stipulation

of Facts (hereafter "the Stipulation") and have agreed to let the Court resolve the

matter on a "case stated" basis, that is without a trial; the Stipulation is not dated

and was filed with the Court on May 6, 2005.  In its initial brief, which was also

filed with the Court on May 6, 2005, the Debtor lodges, without amending or

seeking leave to amend its adversary complaint, an additional avoidance claim

under § 549(a) for the value of another 4,407.3 tons of road salt that it alleges it

also transferred post-petition to Sears; Sears maintains that the Debtor never

even divulged to Sears that it now intends to seek recovery for the additional

4,407.3 tons of road salt until after the parties had already entered into the

Stipulation.  For the reasons set forth below, the Court grants judgment in the

Debtor's favor with respect to its avoidance action regarding the 1,600 ton road

salt transfer; however, the Court rules in Sears' favor with respect to the Debtor's

claim regarding the 4,407.3 ton road salt transfer.

### STATEMENT OF FACTS[1]

An involuntary bankruptcy petition was filed against the Debtor on

December 28, 2001, after which an order for relief under Chapter 11 was

entered on February 21, 2002.  The Debtor and Sears entered into a written

contract on October 18, 2001, for the sale by the Debtor to Sears of 15,000 tons

of road salt (hereafter "the Salt Contract").

The Debtor, at all relevant times, sold two different types of road salt:

Brazilian solar salt (hereafter "Brazilian Salt") and Dominican Republic mined salt

(hereafter "Dominican Republic Salt").  The Salt Contract expressly called for a

sale of 15,000 tons of Brazilian Salt.  Although the Debtor characterized the

distinction between Brazilian Salt and Dominican Republic Salt as insignificant

and charged its customers the same price for both kinds of road salt, Sears

preferred, and thus expressly purchased via the Salt Contract 15,000 tons of,

---

[1]The following facts are the subject of stipulation between the parties and
are set forth in the Stipulation, save for certain factual findings that the Court
makes upon its review of exhibits that were attached to the Stipulation.

2

Brazilian Salt.

The Debtor was experiencing financial difficulties at the inception of the

Salt Contract, and the Debtor consequently planned to close or sell its road salt

business facilities at the conclusion of the 2001-2002 winter season. Included in

the Salt Contract – apparently because Sears was then aware of such financial

difficulties of the Debtor – is a term that ensured that Sears would obtain upfront

a letter from the Debtor's lender to the effect that, after full prepayment by Sears

of the price for the 15,000 tons of purchased road salt, Sears would obtain free

and clear title to such road salt. Sears obtained such letter from the Debtor's

lender on October 17, 2001, after which (a) the Salt Contract was executed on

October 18, 2001, and (b) Sears prepaid the entire contract price for the

purchased road salt, or $472,500,[2] presumably, in accordance with paragraph 12

of the Salt Contract, by October 23, 2001. The Brazilian Salt so purchased by

Sears was identified by the Debtor sometime prior to its purchase by Sears.

The Salt Contract called, at least implicitly, for Sears to remove the

purchased road salt incrementally from the Debtor's facilities. According to

paragraph 5 of the Salt Contract, "[the purchased s]alt must be removed on or

before February 28, 2002." According to paragraph 8 of the Salt Contract, "[a]ny

[of the purchased] salt remaining at the sight [sic] as of Feb[ruary] 28[, 2002], will

be moved out by Sears or become the property of ... [the Debtor]." Paragraph 8

of the Salt Contract expressly provided that ultimately, upon the final removal by

---

[2]15,000 tons multiplied by the Salt Contract price of $31.50 per ton equals
$472,500.

3

Sears of all of the purchased road salt that had been identified, either Sears or

the Debtor would have a claim back against the other for whatever amount of

road salt overage or shortage occurred as a result of, and after, such road salt

removal – that is, after such removal of such road salt by Sears, the total weight

of all road salt so removed by Sears would be compared to 15,000 tons so as to

arrive at an overage (too much salt removed) or shortage (not enough salt

removed) figure.

Sometime between March 4, 2002, and March 7, 2002, Sears removed

the purchased road salt that then remained at the Debtor's facilities, which

amount equalled 4,407.3 tons.  Subsequent to such removal, Sears contended

that it had been shorted 1,946 tons of road salt (hereafter "Sears' Shortage

Claim"); the Debtor disagreed with such contention by Sears.  As a result of

communications between the parties, Sears compromised Sears' Shortage

Claim by agreeing to take 1,600 tons of Dominican Republic Salt rather than the

1,946 tons of Brazilian Salt that Sears alleged it had been shorted.  Sears

removed the aforementioned 1,600 tons of Dominican Republic Salt from the

Debtor's facilities at some point in March 2002.  Sears neither sought nor

obtained relief from the automatic stay imposed by virtue of the Debtor's

bankruptcy case prior to the time in March 2002 when Sears removed the

4,407.3 tons of Brazilian Salt and the 1,600 tons of Dominican Republic Salt.

The Debtor claims that the normal price which it would have charged a

customer for the sale of 1,600 tons of road salt was $36.00 per ton.  The Debtor

also claims that its "bulk price" of $31.50 per ton of road salt sold only applied to

4

road salt sales of 10,000 to 15,000 tons.

## DISCUSSION

The Debtor argues that the 1,600 ton transfer of Dominican Republic Salt to Sears (hereafter "the 1,600 Ton Transfer") is avoidable under § 549(a) because such transfer (a) occurred post-petition, and (b) was neither authorized under any provision of the Bankruptcy Code nor authorized by the Court. The Debtor contends that the 1,600 tons of Dominican Republic Salt should be valued at $36.00 per ton – i.e., the Debtor's non-bulk rate – so that, pursuant to § 550(a)(1), it may, after the avoidance of the 1,600 Ton Transfer, consequently recover $57,600 from Sears, exclusive of interest (i.e., 1,600 tons x $36.00).

The Debtor also argues that the 4,407.3 ton transfer of Brazilian Salt to Sears (hereafter "the 4,407.3 Ton Transfer") is avoidable under § 549(a) because such transfer (a) occurred post-petition, and (b) was neither authorized under any provision of the Bankruptcy Code nor authorized by the Court. The Debtor, pursuant to § 550(a)(1) and subsequent to avoidance of the 4,407.3 Ton Transfer, seeks to recover $138,852, exclusive of interest, as the value for the 4,407.3 tons of Brazilian Salt (i.e., 4,408 tons x $31.50).

Sears raises numerous defenses to a § 549(a) avoidance of the 1,600 Ton Transfer. First, Sears argues that such transfer occurred pre-petition rather than post-petition. Sears argues as much because, it argues in turn, it acquired title to the 1,600 tons of Dominican Republic Salt in October 2001 when it prepaid the entire Salt Contract price for the purchased road salt (i.e., $472,500). Second, Sears maintains that the 1,600 Ton Transfer, even if it occurred post-

5

petition, was authorized by 11 U.S.C. § 1108 as an "ordinary course" transfer

that the Debtor made while it operated its business post-petition.  In support of

such argument, Sears points out that the Salt Contract expressly called for the

Debtor to satisfy Sears' Shortage Claim, and that the 1,600 Ton Transfer was

effected only to satisfy such claim.  Third, Sears contends that, even if the 1,600

Ton Transfer is avoidable under § 549(a), Sears can assert the defense of

equitable recoupment so as to extinguish such avoidance claim.  In particular,

Sears contends that, via equitable recoupment, it may offset against the Debtor's

§ 549(a) avoidance claim vis-a-vis the 1,600 Ton Transfer Sears' claim that it

would have back against the Debtor's bankruptcy estate pursuant to 11 U.S.C.

§ 502(h).  Finally, Sears asserts that, even if the 1,600 Ton Transfer may be

avoided under § 549(a) and may not be successfully defended by way of

equitable recoupment, the most that can be recovered by the Debtor via

§ 550(a)(1) is $8,000.  Sears arrives at the $8,000 figure by setting the value of

the 1,600 tons of Dominican Republic Salt at $5.00 per ton, which rate is that

which the Debtor was able to obtain in a bankruptcy auction sale conducted in

November 2002 of its remaining unsold road salt.

　　　Regarding Sears' contention that the 1,600 Ton Transfer occurred pre-

petition, the Debtor disagrees with Sears' contention that Sears acquired title to

the 1,600 tons of Dominican Republic Salt in October 2001 when Sears prepaid

its $472,500 obligation pursuant to the Salt Contract.  The source of such

disagreement by the Debtor is the Salt Contract itself, which contract, according

to the Debtor, only operated, by its terms, to pass title to Brazilian Salt rather

6

than Dominican Republic Salt. Sears responds to such argument by the Debtor by contending that it was free to, and that it apparently did, waive the term in the Salt Contract that only Brazilian Salt would thereby be purchased.

The Debtor also disagrees with Sears' contention that the 1,600 Ton Transfer was authorized by § 1108 as an "ordinary course" transfer that the Debtor made while it operated its business post-petition. The Debtor so disagrees because, it argues in turn, (a) Sears' Shortage Claim against the Debtor – i.e., a shortage of 1,946 tons of Brazilian Salt which Sears agreed to settle for a transfer of 1,600 tons of Dominican Republic Salt – accrued pre-petition rather than post-petition, (b) it paid such pre-petition claim of Sears post-petition, and (c) post-petition payments of pre-petition claims are, as a matter of law, neither "ordinary course" nor, more importantly, authorized by § 1108. Sears counters the foregoing argument of the Debtor by arguing that Sears' Shortage Claim accrued post-petition rather than pre-petition. Sears argues as much because, it argues in turn, it could not have brought an action for a shortage of road salt under the Salt Contract until March 2002 when it removed from the Debtor's premises the remaining Brazilian Salt that it had purchased via the Salt Contract. Sears appears to concede that, if Sears' Shortage Claim accrued pre-petition, then Bankruptcy Code authority does not exist for the post-petition payment of such claim by the Debtor in any manner.

Sears defends against a § 549(a) avoidance of the 4,407.3 Ton Transfer on two fronts. First, Sears contends that the Debtor, by waiting until the briefing stage in the instant adversary proceeding before first raising its § 549(a)

AO 72A
(Rev. 8/82)

avoidance claim vis-a-vis the 4,407.3 Ton Transfer, essentially waived such claim. Second, Sears maintains that, as was assertedly the case with respect to the 1,600 Ton Transfer, the 4,407.3 Ton Transfer occurred pre-petition rather than post-petition. Sears so argues because, it argues in turn, it acquired title to the 4,407.3 tons of Brazilian Salt in October 2001 when it prepaid its $472,500 obligation pursuant to the Salt Contract.

The Debtor disagrees with Sears' contention that the 4,407.3 Ton Transfer occurred pre-petition rather than post-petition because, argues the Debtor in turn, title to the 4,407.3 tons of Brazilian Salt had reverted to the Debtor at the end of February 2002, or at least approximately one week before Sears removed such salt from the Debtor's premises. The Debtor argues for such reversion of title by pointing to the language in the Salt Contract that (a) required Sears to remove the road salt that it thereby purchased from the Debtor's premises by the end of February 2002, and (b) provided that, absent such removal, such remaining road salt would become the Debtor's property. Sears counters the Debtor's reversion of title argument by asserting that the pertinent Salt Contract language does not provide for such title reversion by the end of February 2002, only that Sears remove the 4,407.3 tons of Brazilian Salt, failing which, at some *unspecified* point in the future, title to such salt would revert to the Debtor.

11 U.S.C. § 549(a) provides, in pertinent part, that "the trustee may avoid a transfer of property of the estate — (1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this

8

title; or (B) that is not authorized under this title or by the court." 11 U.S.C.A.

§ 549(a) (West 1993).  11 U.S.C. § 550(a)(1) provides, in pertinent part, that "to

the extent that a transfer is avoided under section ... 549 ... of this title, the

trustee may recover, for the benefit of the estate, the property transferred, or, if

the court so orders, the value of such property, from — (1) the initial transferee

of such transfer."  11 U.S.C.A. § 550(a)(1) (West 1993).

I.    **The 1,600 Ton Transfer.**

    A.    **The 1,600 Ton Transfer – Pre-Petition or Post-Petition?**

      At the outset, the Court holds that the 1,600 Ton Transfer occurred post-

petition rather than pre-petition.  The Court so holds because the Court, in turn,

rejects Sears' argument that it obtained title to the 1,600 tons of Dominican

Republic Salt in October 2001, that is pre-petition, when it prepaid its $472,500

obligation pursuant to the Salt Contract.  The Court rejects Sears' position that it

obtained title to the 1,600 tons of Dominican Republic Salt in October 2001

because, although Sears then obtained title to the road salt that it purchased via

the Salt Contract, only Brazilian Salt was thereby purchased; since Dominican

Republic Salt was not even the subject of purchase pursuant to the Salt

Contract, title to Dominican Republic Salt could not conceivably have passed to

Sears in October 2001.

      In so holding, the Court concludes that it need not resolve whether, as

Sears argues, Sears could have waived, if it wished, the term in the Salt Contract

that only Brazilian Salt would thereby be purchased so that title would then also

be deemed to have passed with respect to a sufficient amount of Dominican

Republic Salt so as to equal, in conjunction with the Brazilian Salt transferred to

Sears, 15,000 tons of road salt.  The Court concludes that it need not pass on

the efficacy of such a waiver because (a) even presuming *arguendo* the efficacy

of such a waiver, the same was not effected in the instant matter (if at all) until,

at the earliest, March 2002, which time is when Sears first agreed to receive

Dominican Republic Salt rather than Brazilian Salt pursuant to the Salt Contract,

(b) such a waiver in March 2002 would not relate back in time to October 2001

so as to operate then to pass title to Dominican Republic Salt, and (c) such a

waiver in March 2002, that is post-petition and without an ability to relate back

pre-petition to October 2001, would be of no help to Sears' present cause given

that such waiver could do no better than serve to pass title to Dominican

Republic Salt post-petition.

In light of the foregoing, the Court holds that Sears first obtained title to

the 1,600 tons of Dominican Republic Salt in March 2002, that is post-petition,

rather than in October 2001, that is pre-petition, which holding compels the Court

to then hold that the 1,600 Ton Transfer occurred post-petition rather than pre-

petition.

**B.**  **The 1,600 Ton Transfer – "Ordinary Course" and Authorized by
§ 1108?**

The Court also rejects Sears' position that, even if the 1,600 Ton Transfer

occurred post-petition rather than pre-petition, such transfer was nevertheless

authorized under § 1108 as an "ordinary course" transfer to satisfy Sears'

AO 72A
(Rev. 8/82)

Shortage Claim, which claim Sears categorizes as post-petition. While the Court

agrees with Sears that such shortage claim is expressly called for under the Salt

Contract and could be characterized as "ordinary course" absent bankruptcy, the

Court disagrees that such shortage claim is (a) post-petition in nature, and (b)

thus "ordinary course" and authorized under the Bankruptcy Code via § 1108.

Sears contends that Sear's Shortage Claim is post-petition in nature

because, according to Sears, (a) an action on such claim could not have been

brought until March 2002, that is post-petition, which is when, as is contemplated

by the Salt Contract, a shortage of road salt could first have been ascertained,

and (b) a claim does not accrue, as a matter of law, until an action on such claim

can first be brought. For the last of the two preceding points, Sears relies on the

Third Circuit's decision in In re M. Frenville Co., Inc. (Avellino & Bienes v. M.

Frenville Co., Inc.), 744 F.2d 332 (3rd Cir. 1984). However, the Third Circuit in

Frenville held that only a noncontractual cause of action, that is a claim based

not upon a contract, accrues when an action upon such claim can first be

brought. See Frenville, 744 F.2d at 337 (noncontractual indemnity claim arises

when action thereon can first be brought, which, under New York law, is when

indemnitee is first sued by plaintiff in underlying action). With respect to a

contractual cause of action, that is a claim based upon a contract, the Third

Circuit in Frenville held that the same accrues when the pertinent contract is

executed. See Frenville, 744 F.2d at 336-337 (contractual indemnity claim,

although contingent, arises "upon the signing of the agreement"). Unfortunately

for Sears, Sears' Shortage Claim against the Debtor is based upon a specific

11

provision in the Salt Contract, which means that such claim accrued pre-petition in October 2001 when the Salt Contract was executed.  That Sears' Shortage Claim, prior to March 2002, had not yet matured or become fixed, and was thus, prior to said time, an unmatured, contingent claim, does not change the fact that such claim accrued pre-petition, *see* 11 U.S.C.A. § 101(5)(A) (West 1993) ("'claim' means — right to payment, whether or not such right is ... fixed, contingent, matured, [or] unmatured"); as an aside, the Court notes that, prior to March 2002, the Debtor likewise possessed an unmatured, contingent claim against Sears for any overage of road salt that Sears removed from the Debtor's premises pursuant to the Salt Contract (the contingency of such an overage never occurred, of course, thereby extinguishing such claim).

Because Sears' Shortage Claim was pre-petition in nature, the satisfaction of such claim post-petition via the post-petition 1,600 Ton Transfer was necessarily neither "ordinary course" nor, consequently, authorized under the Bankruptcy Code via § 1108.  *See* In re Allegheny Health, Education and Research Foundation, 313 B.R. 673, 677-678 (Bankr.W.D.Pa. 2004) (citing numerous authorities for proposition that § 1108 "'does not authorize the debtor to make postpetition payments with respect to prepetition debts'").

## C.    **Equitable Recoupment.**

As for Sears' equitable recoupment argument, the Court holds that Sears may not, via such doctrine, offset against the Debtor's § 549(a) avoidance claim vis-a-vis the 1,600 Ton Transfer Sears' claim that it would have back against the

12

Debtor's bankruptcy estate pursuant to § 502(h).  The doctrine of recoupment is

similar in some, but dissimilar in other, respects to the doctrine of setoff.  *See* 5

<u>Collier on Bankruptcy</u> ¶ 553.10 at 553-98 to 553-99 (Bender 2004).

> The justification for the recoupment doctrine is that where the
> creditor's claim against the debtor arises from the same transaction
> as the debtor's claim, it is essentially a defense to the debtor's
> claim against the creditor rather than a mutual obligation, and
> application of the limitations on setoff in bankruptcy would be
> inequitable.

<u>Lee v. Schweiker</u>, 739 F.2d 870, 875 (3rd Cir. 1984); *see also* <u>B & L Oil Co.</u>, 782

F.2d 155, 157 (10th Cir. 1986) (citing <u>Lee</u>).  Sears contends that the recoupment

it advances is permissible because, argues Sears in turn, the § 502(h) claim that

it would have back against the Debtor's bankruptcy estate post-avoidance, which

claim would essentially be the mere reestablishment of Sears' claim against the

Debtor that existed prior to, and that was satisfied by, the effectuation of the

1,600 Ton Transfer, arises out of the same transaction as does the Debtor's

§ 549(a) avoidance claim vis-a-vis the 1,600 Ton Transfer.  The Court's

acknowledgment of the interrelationship between the two claims as described by

Sears notwithstanding, the Court rejects Sears' recoupment argument for several

reasons.

First, the Court holds, as a matter of law, that an avoidance action

defendant, such as a § 549(a) defendant, cannot, via equitable recoupment,

offset against its avoidance liability – i.e., liability to a bankruptcy estate to return

13

transferred property or its value – its future § 502(h) claim, that is essentially the

original debt that was satisfied with the avoided transfer.  The Court so holds

because, "[i]n the absence of this rule[,] no ... [avoidance] action could

[generally] be successfully maintained."  In re Marketing Resources International

Corp., 35 B.R. 353, 356 (Bankr.E.D.Pa. 1984) (not allowing a creditor in a

preference action to "set off against his liability for the return of the preferential

payments the original debt on which the payments were applied ... [for] to permit

this to be done would defeat the right to recover the preference, and render the

statute futile"); see also In re Stoecker, 131 B.R. 979, 984 (Bankr.N.D.Ill. 1991)

(disallowing recoupment as a defense to a preference action for the same

reason that setoff is disallowed "because in essence, recoupment is merely the

setoff defense as limited by the same transaction requirement"); In re Cavalier

Homes of Georgia, Inc., 102 B.R. 878, 890 (Bankr.M.D.Ga. 1989) (same holding

as Marketing Resources); In re Chase & Sanborn Corp., 124 B.R. 371, 373-374

(Bankr.S.D.Fla. 1991) (same); In re Georgia Steel, Inc., 38 B.R. 829, 840

(Bankr.M.D.Ga. 1984) (disallowing setoff of an administrative claim against a

preference obligation).  The Court observes (a) that, with the exception of

Stoecker, the foregoing decisions involve the assertion of setoff rather than

recoupment, and (b) that each of such decisions involve a preference rather than

a § 549(a) avoidance action.  However, the Court agrees with Stoecker that,

although the doctrines of setoff and recoupment are distinct, the two

nevertheless are indistinguishable vis-a-vis whether they may be used, in

conjunction with a § 502(h) claim, as a defense to a preference action;

14

AO 72A
(Rev. 8/82)

accordingly, the rationale in <u>Marketing Resources</u>, <u>Cavalier Homes</u>, <u>Chase &</u>

<u>Sanborn</u>, and <u>Georgia Steel</u> applies regardless of whether setoff or recoupment

is asserted as a defense to a preference action. Furthermore, because

preference actions cannot be distinguished from other types of avoidance

actions when considering whether recoupment or setoff is permitted as a

defense thereto, the Court extends the holdings in the foregoing decisions, as

well, to any type of avoidance action, including a § 549(a) action. Applying the

legal rule as formulated above to the instant matter, Sears may not recoup as it

presently seeks to do.

Second, the Court holds, as a matter of law, that for the defense of

recoupment to be available to a defendant, such defendant must presently

possess a claim against its plaintiff that can be offset against such defendant's

liability to such plaintiff. Unfortunately for an avoidance action defendant, a

future § 502(h) claim is just that – a future claim, which is to say a claim that, as

of the date when an avoidance action is being waged, does not presently exist,

*see* 11 U.S.C.A. § 502(h) (West 1993) (claim under § 502(h) accrues after,

rather than before or even during, a successful avoidance action, and such

claim, pursuant to 11 U.S.C. § 502(d), does not even accrue until property is

actually recovered by avoidance action plaintiff pursuant to § 550); <u>Chase &</u>

<u>Sanborn</u>, 124 B.R. at 374 (disallowing setoff of § 502(h) claim against a

preference avoidance claim because "section 502(d) bars the allowance of a

claim of a creditor that has received a preference[, such as the claim under

§ 502(h),] unless [and until] the preference is returned"), and so cannot be

15

utilized for recoupment purposes.  Application of the foregoing rule to the instant

matter also dictates a conclusion that Sears may not recoup as it presently seeks

to do.

Finally, the rationale for allowing recoupment in bankruptcy is often

"based on the treatment of *executory* contracts in bankruptcy: a debtor may not

assume the favorable aspects of a contract (post-petition payments) and reject

the unfavorable aspects of the same contract (the obligation to repay pre-petition

overpayments by means of 'recoupment')." Lee, 739 F.2d at 876 (emphasis

added); *see also* B & L Oil, 782 F.2d at 157 & 159 (citing Lee and In re Maine,

32 B.R. 452 (Bankr.W.D.N.Y. 1983)); In re St. Francis Physician Network, Inc.,

213 B.R. 710, 719 (Bankr.N.D.Ill. 1997) (citing other cases for same proposition).

Such rationale is wholly inapplicable to the recoupment presently advanced by

Sears, however, because the Salt Contract not only is presently no longer

executory – indeed, such contract has long since been fully performed by both

parties thereto – but, in fact, was not even executory in nature as of the Debtor's

involuntary petition filing date given that Sears had fully performed under the Salt

Contract in October 2001 by then prepaying the entirety of its obligation

thereunder.  The foregoing observation also points in favor of rejecting Sears'

recoupment argument.

     **D.**     **What is the value that the Debtor may recover via § 550(a)(1)?**

In light of all of the foregoing, the 1,600 Ton Transfer shall be avoided

pursuant to § 549(a).  The next issue to address is the Debtor's recovery under

16

§ 550(a)(1).  "Section 550(a) is intended to restore the [Debtor's bankruptcy]

estate to the financial condition it would have enjoyed if the transfer had not

occurred." In re Centennial Textiles, Inc., 220 B.R. 165, 176 (Bankr.S.D.N.Y.

1998); see also In re Serrato, 214 B.R. 219, 232 (Bankr.N.D.Cal. 1997) (same).

The Debtor bears the burden of proving what may properly be recovered under

§ 550(a)(1).  See In re Musurlian, 97 B.R. 985, 987 (Bankr.W.D.Wis. 1989);

Serrato, 214 B.R. at 231; Kidder Skis International v. Williams, 60 B.R. 808, 811

(W.D.Mo. 1985).

        Because, the Court presumes, the 1,600 tons of Dominican Republic Salt

that was transferred to Sears in March 2002 has since perished, the Court

cannot, pursuant to § 550(a)(1), order that Sears return such road salt to the

Debtor.  As well, because the Debtor has ceased to exist, it makes no sense for

the Court at this juncture to order Sears to return to the Debtor 1,600 tons of salt

similar in nature to that which Sears obtained from the Debtor in March 2002.

Therefore, the Court shall order Sears, pursuant to § 550(a)(1), to pay to the

Debtor the value of the 1,600 tons of Dominican Republic Salt.  What is the

appropriate value to attribute to such road salt?

        At the outset, the Court holds that the 1,600 tons of Dominican Republic

Salt should not be valued, as the Debtor argues, at $36.00 per ton, which rate

was the Debtor's going non-bulk rate prior to its entry into bankruptcy.  The Court

rejects the $36.00 per ton going rate because (a) the Debtor can only recover via

§ 550(a)(1), as set forth above, that which it could have recovered had the 1,600

Ton Transfer not been effected, and (b) the Court concludes, in turn, that, had

17

such transfer not been effected, the Debtor would never have obtained its going rate of $36.00 per ton for the liquidation of the 1,600 tons of Dominican Republic Salt. The Court draws the latter conclusion

(a)     because, had the Debtor never transferred the 1,600 tons of Dominican Republic Salt, then the same would merely have been subjected to the same forced liquidation sale that the Debtor ultimately conducted of the road salt that it did retain as of March 2002 – the preceding follows because, as of March 2002, the Debtor (i) was already in bankruptcy, and (ii) contemplated liquidating its road salt business (indeed, the Debtor stipulates that, as of the making of the Salt Contract, the Debtor planned to close or sell its road salt business facilities at the conclusion of the 2001-2002 winter season); and

(b)     since the forced sale market for road salt held in March 2002 was set at no more than $12.00 per ton, which rate is that which was offered for the purchase of the Debtor's remaining road salt at a May 21, 2002 hearing held in response to the Debtor's motion to sell (May 21, 2002, is approximately but two months after the effectuation of the 1,600 Ton Transfer) – although such bid was rejected on May 21, 2002, as inadequate,[3] such bid nevertheless turned out to be the highest offer ever made for the road salt retained by the Debtor as of March 2002, and such

---

[3]The Debtor concedes in its last brief filed in the instant adversary proceeding, at page 6, that such bid for $12.00 was made and then rejected at a hearing held on May 21, 2002.

18

offer constitutes evidence as to the value of such salt of a quality far

superior to that which is afforded by the price that the Debtor would have

sold such salt had it remained a going concern.[4]

However, the Court also does not accept, as Sears argues, that the proper

valuation under § 550(a)(1) is the $5.00 per ton rate which the Debtor actually

accepted for the November 2002 bankruptcy auction sale of its remaining unsold

road salt.  The Court instead finds as a more accurate measure of the value of

such salt in March 2002 the $12.00 per ton rate, particularly given that such rate

was offered substantially more closely in time to March 2002 than was the $5.00

per ton rate.

Valuing the 1,600 tons of Dominican Republic Salt at $12.00 per ton

yields a total value to be recovered from Sears via § 550(a)(1) of $19,200,

exclusive of appropriate interest (i.e., 1,600 tons x $12.00).

## II.    The 4,407.3 Ton Transfer.

With respect to Sears' argument that the Debtor waived its § 549(a)

avoidance claim regarding the 4,407.3 Ton Transfer, the Court declines to rule,

as Sears wishes, that the Debtor waived such claim by virtue of not having raised

the same until it filed its first brief in the instant adversary proceeding.  As an

initial matter, the Court is left without any way to assess the accuracy of Sears'

contention that the Debtor hid from Sears the Debtor's intention to now seek

recovery for the 4,407.3 Ton Transfer until after the parties had already entered

---

[4]For the reasons set forth prior to the instant footnote, the Court would
reject the Debtor's going bulk rate for sales of road salt of $31.50 per ton as well.

19

into the Stipulation.  The Court finds as it does because (a) the Stipulation is not

dated, and (b) the Stipulation and the Debtor's first brief were both filed with the

Court on May 6, 2005.  In light of the foregoing facts, it is entirely possible that

(a) the Stipulation was executed on May 6, 2005, (b) Sears was aware of the

Debtor's relevant intent for some short period of time prior to the execution of the

Stipulation even if an informal agreement as to the contents of the Stipulation

preceded the point when Sears learned of such intent, and (c) Sears thus had

time to recant its agreement to enter into the Stipulation, that is Sears had the

opportunity to refuse to execute the Stipulation, yet it went ahead and executed

the same notwithstanding its knowledge that the Debtor now intended to pursue

a § 549(a) avoidance claim regarding the 4,407.3 Ton Transfer.  Furthermore,

and even if Sears is correct as to the chronology of those events just discussed,

the case that Sears relies on for its waiver argument – i.e., Evans Products Co.

v. West American Insurance Co., 736 F.2d 920 (3rd Cir. 1984) – actually stands

for the proposition that a claim untimely raised nevertheless may be salvaged if a

trial court, in its discretion, permits a complaint to be amended so as to plead

such claim.  See Id. at 924.  Because the Court is aware of Third Circuit

precedent and other persuasive case authority for the proposition that a

complaint may be amended prior to a trial court's decision, see, e.g., Adams v.

Gould Inc., 739 F.2d 858, 868-869 (3rd Cir. 1984); Eddy v. Virgin Islands Water

and Power Authority, 256 F.3d 204, 209-210 (3rd Cir. 2001); DRR, L.L.C. v.

Sears, Roebuck and Co., 171 F.R.D. 162, 168 (D.Del. 1997), and since a

decision had not yet been rendered by the Court when the Debtor first raised its

20

§ 549(a) avoidance claim regarding the 4,407.3 Ton Transfer, the Court will not

find such claim to have been waived.

The foregoing notwithstanding, the Court finds there to be no merit to the

Debtor's § 549(a) avoidance claim regarding the 4,407.3 Ton Transfer.  The

Court so holds because the 4,407.3 Ton Transfer occurred pre-petition rather

than post-petition.  The 4,407.3 Ton Transfer was a pre-petition rather than a

post-petition transfer because (a) Sears acquired title to the 4,407.3 tons of

Brazilian Salt in October 2001 when it prepaid its $472,500 obligation pursuant to

the Salt Contract, and (b) such title did not, as the Debtor argues, revert to the

Debtor on February 28, 2002, that is approximately one week before Sears

removed such salt from the Debtor's premises.

The Debtor argues that such title reverted to itself on February 28, 2002,

by virtue of (a) the fact that Sears had not, as of such date, yet removed such

salt from the Debtor's premises, and (b) pertinent language in the Salt Contract,

that is the language requiring Sears to remove its purchased road salt from the

Debtor's premises by the end of February 2002 failing which such salt would

become the Debtor's property.  The Court agrees with the Debtor that, by virtue

of the pertinent Salt Contract language, a reversion of title vis-a-vis unremoved

road salt was expressly contemplated by the parties.  However, and

unfortunately for the Debtor, the Court finds the Salt Contract to be silent as to

when such reversion of title would be effected.  Consequently, the Court

construes the pertinent Salt Contract language such that it (a) effected a

reversion of title vis-a-vis unremoved road salt but only at some unspecified point

21

in the future, not as of the end of February 2002, and (b) did not effect such a

reversion of title prior to March 7, 2002, which date is the latest date by which

Sears removed the 4,407.3 tons of Brazilian Salt.  The Court's construction of

the pertinent Salt Contract language has the added benefit of being favored by

the law.  In particular, by virtue of the Court's construction of such contract

language, the same does not operate to work a forfeiture of title to the 4,407.3

tons of Brazilian Salt that Sears indisputably had obtained months earlier; to

construe such contract language otherwise, on the other hand, would most

certainly work a forfeiture of such title.  Because Pennsylvania's Supreme Court

"has always sought to avoid forfeitures, and has interpreted contracts in such a

way as to effectuate that purpose," Carsek Corp. v. Stephen Schifter, Inc., 246

A.2d 365, 369 (Pa. 1968); see also Barraclough v. Atlantic Refining Co., 326

A.2d 477, 479 (Pa.Super.Ct. 1974) (same); Bedillion v. W.A. Wilson Stave Co.,

Inc., 413 A.2d 411, 413 (Pa.Super.Ct. 1979) (same); Williams v. Vesley, 434

A.2d 196, 197-198 (Pa.Super.Ct. 1981) (same); Liazis v. Kosta, Inc., 618 A.2d

450, 455 (Pa.Super.Ct. 1992) (same); see generally 17A C.J.S. Contracts § 334

(West 2004) (same), "particularly where there has been considerable part

performance," Liazis, 618 A.2d at 455; see also Carsek, 246 A.2d at 369 (same);

Bedillion, 413 A.2d at 413 (same), and since Sears has performed considerably,

if not entirely, under the Salt Contract, this Court's construction of the pertinent

Salt Contract language is thus favored by the law.  Accordingly, title to the

4,407.3 tons of Brazilian Salt never reverted to the Debtor prior to the removal of

such salt by Sears from the Debtor's premises.

AO 72A
(Rev. 8/82)

In light of all of the foregoing, the 4,407.3 Ton Transfer cannot be avoided pursuant to § 549(a), which means, of course, that the Debtor is not entitled to any sort of recovery with respect to such transfer under § 550(a)(1).

## **CONCLUSION**

For all of the foregoing reasons, the 1,600 Ton Transfer shall be avoided pursuant to § 549(a) and the Debtor, pursuant to § 550(a)(1) and with respect to such avoidance, shall recover from Sears $19,200 plus appropriate interest. However, the 4,407.3 Ton Transfer cannot be avoided pursuant to § 549(a), which means, of course, that the Debtor is not entitled to any sort of recovery with respect to such transfer under § 550(a)(1).

An appropriate order will be entered.

**BY THE COURT**

**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

**DATED:**      **June 16, 2005**

23

AO 72A
(Rev. 8/82)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                    :
                                          :
**ROCHEZ BROS., INC.,**                   :
                                          :   **Bankruptcy No. 01-32890-MBM**
                       Debtor.            :
.............................................................

Rochez Bros., Inc.,                       :   **Chapter 11**
                    Plaintiff,            :
                                          :
               v.                         :   **Adversary No. 04-2904-MBM**
                                          :
**Sears Ecological Applications**         :
**Company, Inc.,**                        :
                    Defendant.            :

## ORDER OF COURT

**AND NOW,** this **16th day** of **June, 2005,** for the reasons set forth in the

accompanying Memorandum Opinion of the same date;

   it is **hereby ORDERED, ADJUDGED, AND DECREED** that

(a)   the 1,600 Ton Transfer, that is the Debtor's transfer of 1,600 tons of road

      salt in March 2002 to the instant defendant, shall be avoided pursuant to

      § 549(a), and the Debtor, pursuant to § 550(a)(1) and with respect to such

      avoidance, **shall recover** from such defendant **$19,200 plus appropriate**

      **interest**; and

(b)   the 4,407.3 Ton Transfer, that is the Debtor's separate transfer of an

      additional 4,407.3 tons of road salt, shall not be avoided pursuant to

      § 549(a), which means, of course, that the Debtor may not recover

anything with respect to such transfer under § 550(a)(1).

**BY THE COURT**



**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

copies to:

Charles E. Bobinis, Esq.
Bernstein Law Firm
Suite 2200 Gulf Tower
Pittsburgh, PA 15219

Joel M. Helmrich, Esq.
Gary A. Kerns, Esq.
Meyer, Unkovic & Scott LLP
1300 Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

FILED

JUN 1 6 2005

CLERK, U.
WEST. D

2

AO 72A
(Rev. 8/82)